UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------
FREDERICK DIAZ,

                    Plaintiff,


        -against-             CIVIL RIGHTS COMPLAINT
                                   PURSUANT TO
JAMES F. DONAHUE, Superintendent,     42 U.S.C. § 1983
CHRISTOPHER YEHL, First Dep. Superintendent,
TIMOTHY J. CARROLL, Dep. Supt. of Security,
GREGORY A. KELLER, Dep. Supt. of Security,  Case No. 22CV6559
SCOTT B. HENRY, Captain,
DANIEL J. CHAPMAN, Lieutenant,
TIMOTHY T. TOMPKINS, Sergeant,
SHAWN L. DOMINIKOSKI, Correction Officer,
BRITTANY A. AUSTIN, Correction Officer,
JOHN DOE, Correction Officer,
JOHN DOE, Correction Officer,
JOHN DOE, Correction Officer,
JOHN DOE, Correction Officer,
J. CONDI, MHU Registered Nurse,
COURTNEY SULLIVAN, MHU Social Worker,
M. MEYERS, OSI Investigator,            Jury Trial Demanded



                        Defendants.
-----------------------------------------------

     Plaintiff alleges as follows:


## JURISDICTION AND VENUE

    1. Plaintiff institutes this proceeding and invokes the jurisdiction of this Court under and by virtue of the Civil Rights Act, 42 U.S.C. §1983, to obtain the cost of this suit and damages suffered by Plaintiff caused by the Defendants' violation of his rights as guaranteed by the First, Eighth and Fourteenth Amendments of the Constitution of the United States, and by federal law.

    2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343(3) and (4), and 2201.

    3. The violation of Plaintiff's rights as alleged herein was committed within the State of New York, specifically at Elmira Correctional Facility.


## PARTIES

    4. Plaintiff Frederick Diaz (#86B2129) was at all times relevant

herein a convicted and sentenced state prisoner of the Department of Corrections incarcerated at Elmira Correctional Facility, Box 500, Elmira, New York 14901.

5. Defendant James F. Donahue was at all times relevant herein the Superintendent of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

6. Defendant Christopher Yehl was at all times relevant herein the First Deputy Superintendent of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

7. Defendant Timothy J. Carroll was at all times relevant herein the Deputy Superintendent of Security of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

8. Defendant Gregory A. Keller was at all times relevant herein the Deputy Superintendent of Security of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

9. Defendant Scott. B. Henry was at all times relevant herein a Captain of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

10. Defendant Daniel J. Chapman was at all times relevant herein a Lieutenant of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

11. Defendant Timothy T. Tompkins was at all times relevant herein a Sergeant of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

12. Defendant Shawn Dominikoski was at all times relevant herein a Correction Officer of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

13. Defendant Brittany A. Austin was at all times relevant herein a Correction Officer of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

14. Defendant John Doe was at all times relevant herein a Correction Officer of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

15.   Defendant John Doe was at all times relevant herein a Correction Officer of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

16.   Defendant John Doe was at all times relevant herein a Correction Officer of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

17.   Defendant J. Condi was at all times relevant herein an MHU Registered Nurse of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

18.   Defendant Courtney Sullivan was at all times relevant herein an MHU Social Worker of Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14901.

19.   Defendant M. Meyers was at all times relevant herein an Investigator of the Office Of Special Investigations from the Department of Correctional Services, State Campus, 1220 Washington Avenue, Albany, New York 12226.

## Previous Lawsuits

20.   Plaintiff filed an Article 78 Petition in Albany County Supreme Court, Index No. 3945-20, in regards to one of the claims in this lawsuit. The claim concerns a false misbehavior report which was written against Plaintiff charging him with being in possession of personal employee information for having an employee roster, and with contraband for having a map of New York State. Said Petition was thereafter transferred to the Appellate Division, Third Department, Docket No. 532483. On June 17, 2021 the Third Department annulled the charge of possession of employee information concerning the employee roster since it was not supported by substantial evidence, but upheld the contraband charge. See Diaz v. Annucci, 195 A.D.3d 1297.

21. Plaintiff has never had a case dismissed based on the "three strikes rule," or for any other reason.

22. Plaintiff has filed no other lawsuit dealing with the same facts involved in this action.

## FIRST CLAIM
### First Amendment Violations
### Retaliation For Possessing An Employee Roster

23. On December 20, 2019 the Law Library at Elmira Corr. Facility was searched. This occurred due to a note which was sent to the Administration which falsely claimed that the clerks were committing certain illegal acts, which included selling personal employee information. The supposed employee information, however, was actually a legally obtained, via FOIL (from the facility itself), employee roster which, per the Department's rules, did not contain any personal employee information. In fact, for litigation/grievance reasons, employee rosters are considered to be Law Library reference material.

24. Plaintiff, who had worked in the Law Library for years as a paralegal, had his desk and drawer searched along with the rest of the clerks. During the search the staff discovered that Plaintiff had an employee roster, a map of New York State, and various prison pamphlets. Plaintiff had made a copy of an updated roster from an inmate who had obtained one through the FOIL process in order to assist inmates with their litigation/grievances. Since the employee roster was a government document, Plaintiff had a First Amendment right to possess such. As for the map, it was a general state map from an approved encyclopedia which had been donated to the Law Library, the same type of map inmates can receive in basic atlases/almanacs. And the prison pamphlets were all from approved prisoner rights organizations which were received directly through the mail. Nothing Plaintiff had was illegal.

25. During the search of the Law Library, which Defendant Chapman personally oversaw, all the clerks were sent back to their cells. Shortly thereafter, Defendants Dominikoski and John Doe went to Plaintiff's cell in order to search it. This search was ordered by Defendant Chapman. Plaintiff was taken out of his cell and placed in the shower on the company. Plaintiff objected to this since this was being done so that Plaintiff could not view the search of his cell, which he had a right to view per Directive #4910. Afterwards, Dominikoski and John Doe proceeded to demolish Plaintiff's cell for approximately forty minutes in complete violation of Directive #4910. Plaintiff was then sent back to his cell and a few minutes later was

told by Sgt. Sambroski to get dressed, that he was being sent to the SHU, even though no contraband was found in his cell.

26. Due to Plaintiff's cell being an unmitigated disaster, Plaintiff literally could not find his pants. Despite this, Sgt. Sambroski ordered that Plaintiff be handcuffed and taken to the SHU in his underwear, just to humiliate him. While Plaintiff was being escorted to the SHU he asked Sambroski why he was being taken there. Sambroski then started raving that Plaintiff had an employee roster. To that Plaintiff said, "You're sending me to SHU for having a legally obtained document we get through FOIL?" He replied, "No, you don't," really nasty, and then accused Plaintiff of selling the employee roster. Plaintiff stated, "Why the fuck would I sell a document we can easily get through FOIL?" Sambroski then said, "I have proof you're selling them. You're just fishing for information." Sambroski's remarks made it clear that Defendant Chapman had illegally ordered Defendants Dominikoski and John Doe to tear Plaintiff's cell apart, and have Plaintiff sent to the SHU, simply because he believed that Plaintiff could not be in possession of an employee roster, which he was supposedly selling to other inmates. (Sgt. Sambroski's exact role in the search is unknown at this time.)

27. Instead of being taken to the SHU, Plaintiff was actually taken to the long-term keeplock unit in I-Block. While in this unit an inmate is allowed to have all of his property. However, this did not avail Plaintiff since, later on that night, when Defendants Austin and John Doe packed up Plaintiff's cell they deliberately threw away no less than a third of his property despite all of his property having been legally obtained. As with the destructive cell search, this was maliciously done just to retaliate against Plaintiff. In addition to this, for no legitimate reason whatsoever Defendant Chapman had all of Plaintiff's legal material confiscated, including his stamps, address book, and a variety of reference material, leaving him with no ability to do legal work or write to anybody. This was done not just to retaliate against Plaintiff, but to try and obstruct any legal complaints/grievances he might make.

28. The next morning Plaintiff was still so angry over the loss of so much of his property that he requested to speak to a sergeant about

such. He was then sent downstairs and placed in a slopsink to supposedly speak to Defendant Tompkins. However, Tompkins asked the MHU Nurse, Defendant Condi(?) (exact spelling unknown), to speak to Plaintiff. Condi then began to ask Plaintiff questions about his state of mental health, if he was feeling suicidal. Plaintiff told her that he was sent downstairs to speak to the sergeant about his massive property loss and that this did not concern her since there was nothing she could do for him. Plaintiff asked her over and over again why she was even speaking to him. Condi, though, just kept pressing Plaintiff with her questions. Plaintiff continued to be reluctant to answer her questions since he realized that she wanted him to falsely incriminate himself by saying that he was feeling suicidal, despite Plaintiff having a First Amendment right to decide what to say or what not to say. In the end, even though Plaintiff presented no indication that he intended to hurt himself, and even though he ended up telling Condi this (which the MHU records reveal), Condi illegally took it upon herself to aid and abet the staff in their retaliation against Plaintiff by ordering him to be placed on a one-to-one suicide watch as a favor to Tompkins. By doing so she prevented Plaintiff from speaking to Tompkins about his property loss, exactly what Tompkins intended when he asked Condi to speak to Plaintiff.

29. Despite his protests, Plaintiff was handcuffed and forcibly taken to a dirty observation room in the hospital which contained a filthy mattress. While there Plaintiff was given only a smock and two small coverings to cover himself with even though this was woefully insufficient to provide any warmth and prevent him from shivering over the weekend due to the cold. Plaintiff was also not provided with any soap to wash his hands with after he used the bathroom or any other hygienic product. This was being done deliberately in order to further retaliate against him.

30. The MHU records reveal that while Plaintiff was in the hospital he was continuously yelling and banging/kicking/punching the door to be let out. And that when the nurses tried to talk to him, including Condi, he raved at them for having violated his constitutional rights. However, no one cared to address any of Plaintiff's concerns, letting him suffer.

31. The day after Plaintiff was taken to the hospital, he spoke to Defendant Keller, who happened to be making his rounds there. Plaintiff not only informed Keller of the illegal trashing of his cell, but also about the huge loss of his property and legal material due to Plaintiff having a legally obtained employee roster. In addition, Plaintiff mentioned how he was illegally placed under observation by Condi. Although Keller informed Plaintiff that he knew employee rosters were not illegal to possess, he absurdly told Plaintiff that he could not do anything about his situation even though everything that occurred with Plaintiff was security related. It therefore became apparent to Plaintiff that Keller was also aiding and abetting his staff in their retaliation against him. [Note: Plaintiff subsequently discovered, in response to a grievance, that it was Keller who had ordered the Law Library to be searched due to information he had received. So Keller had only gone to the hospital in order to obtain information from Plaintiff.]

32. The following Monday Plaintiff spoke to Defendant Sullivan. The MHU records reveal that Plaintiff also raved at her about his constitutional rights having been violated, not only by him having been illegally placed in an observation cell, but also due to the conditions of his confinement. However, Sullivan was not interested in hearing anything Plaintiff had to say. That was because she planned on further retaliating against Plaintiff.

33. Sullivan informed Plaintiff that he would be released that morning from observation. However, when Plaintiff was taken to the MHU building to supposedly be processed out, he was told that Sullivan recommended that he be kept in observation another day because she did not like the way Plaintiff spoke to her. Sullivan did this not only out of spite, but as a favor to the staff, since there was no valid reason for Plaintiff to have been held for another day.

34. Needless to say, this made Plaintiff so angry that he nearly went to blows with the security staff there in order to be released. However, this was averted by the mysterious appearance of Defendant Keller, who also just happened to be making his rounds of the MHU at that exact time. Keller spoke to Plaintiff and again informed him that he could do nothing about his current situation, but promised him that he would look into his allegations of staff misconduct if Plaintiff

remained in observation for another day, to which Plaintiff eventually consented to. (This, however, turned out to be another lie since Keller never ended up investigating or remedying any of Plaintiff's concerns due to his participation in the retaliation.)

35. The next day, when Plaintiff spoke to Sullivan again, the MHU records reveal that Plaintiff was infuriated over his situation and again mentioned to her that his confinement amounted to cruel and unusual punishment (for the second time Plaintiff was deliberately not provided with any soap or hygiene product). This did not matter to Sullivan, though. She made it clear to Plaintiff that if he continued to complain about what was being done to him she would ensure that he remained in observation indefinitely, a clear threat. This is how Plaintiff knows that both Condi and Sullivan conspired with Defendant Tompkins (and perhaps even Keller) to retaliate against him, since the staff were very well aware that Plaintiff is a seasoned paralegal with a long history of filing lawsuits/grievances.

36. When Plaintiff was sent back to his cell in I-Block later on that morning, he discovered that every single item of value that he had had been stolen from his cell, leaving his cell practically barren. The inmates on the company informed him that two Defendant John Doe officers had gone in his cell and came out with two property bags full of items. Obviously, this massive theft of Plaintiff's property was done to further retaliate against him. And it was no doubt orchestrated by Defendant Tompkins, who not only had Plaintiff sent to observation, but was also the sergeant on duty throughout Plaintiff's time in observation. Nothing happened in I-Block without Tompkin's knowledge.

37. Needless to say, this massive theft of Plaintiff's property had him infuriated to no small degree. Plaintiff tried to speak to several officers about this who passed by his cell but was being deliberately ignored. So Plaintiff put an electric cord around his neck to get their attention. This resulted in Plaintiff being sent back downstairs to speak to Defendant Tompkins. He told Plaintiff that he would look into the theft, but he never bothered. Instead, Tompkins had Plaintiff sent back to observation, where once again he was told that if he continued to complain about the retaliation being done to

him he would be kept in observation indefinitely. Plaintiff was finally released back to I-Block on December 26, 2019.

38. When Plaintiff returned to his cell, Defendant Keller was making his rounds of the block with the Superintendent. Plaintiff stopped him, showed him his nearly barren cell, and informed him that the staff had robbed nearly all of his property. Keller stated he would look into it but, like Tompkins, he never bothered to do so. [Note: when Plaintiff filed a grievance about this it was sent to Tompkins to be investigated. However, in order to cover up the theft by the staff, Tompkins stated that Plaintiff's property was stolen by unknown inmates even though Plaintiff was on a keeplocked company in which all the inmates were always locked in their cells.]

39. After Plaintiff returned to I-Block he was given a Tier III misbehavior report charging him with possessing employee information (the employee roster), contraband (the map), and unauthorized literature (the prison pamphlets). The report never alleged that Plaintiff sold the employee roster. At the conclusion of the hearing the Hearing Officer dismissed the unauthorized literature charge yet found Plaintiff guilty of possessing employee information and contraband, even though both the roster and map had not been illegally obtained. Plaintiff was thereafter sentenced to 90 days keeplock with 60 days suspended. Since these charges only ended up amounting to 30 days keeplock there was never any valid reason for Plaintiff to have been sent to I-Block to begin with, especially since the Appellate Division, Third Department, ended up reversing and expunging the charge of possessing employee information.

[Note: it needs to be pointed out that although another clerk was actually found to have an employee roster in his cell, along with an excessive number of stamps (338), he was never sent to I-Block or had his cell trashed even though the note which had caused the search of the Law Library actually implicated him in the misconduct. This disparate treatment is indicative of the targeted retaliation against Plaintiff.]

40. Aside from Tompkins having orchestrated the massive theft of Plaintiff's property, he continued to retaliate against Plaintiff by denying him a razor to shave with throughout the entire time Plaintiff

was keeplocked, for no legitimate reason whatsoever, even though Plaintiff's beard trimmers and electric razor had been stolen by the staff. [Note: after Plaintiff filed a grievance on this matter Tompkins claimed that he never provided him with a razor since Plaintiff was in the MHU every Saturday when razors were given out, which the records reveal is thoroughly untrue.]

41. While Plaintiff was keeplocked most of his legal papers and other material were mysteriously returned to him 13 days later, on January 2, 2020. And nearly all the papers were in a state of disrepair, wet and torn apart. Included with the papers was a Cell Frisk/Contraband Receipt from C.O. Pfunter which revealed that the papers had not even been looked at until 8 days later, on December 28, 2019, and that they had continued to be withheld from Plaintiff for an additional five days after that. This meant that there was never any urgent reason to have all of Plaintiff's legal material confiscated to begin with except to retaliate against him. (Plaintiff is still unsure of Pfunter's role in this matter, if he actually caused the papers to be ruined, or if that occurred during the destructive search of Plaintiff's cell.)

42. On January 29, 2020, nearly three weeks after his hearing ended, Plaintiff's prison pamphlets were finally returned to him. This only occurred after Plaintiff was forced to file a grievance as to their whereabouts, since his informal requests to have them returned were being deliberately ignored.

43. On February 25, 2020, after 66 days, and only due to Plaintiff having filed a grievance about the ruined state of the legal material he had received, the rest of Plaintiff's legal material was finally returned to him by Defendant Chapman (albeit with some omissions). This was when Plaintiff discovered who had actually ordered his papers to be confiscated and who had them. Chapman, though, never cared to tell Plaintiff why he had his papers confiscated to begin with, or even why they had been withheld for so long despite Plaintiff having been in severe need of them.

44. On March 3, 2020, Plaintiff went before the Program Committee and was reinstated back to his Law Library job. This was done because Plaintiff could not be removed from his program unless he received a

keeplock disposition in excess of 30 days, according to the facility's own FOM #18.01(III)(D) ("Inmate Program Placement"), and because Plaintiff's removal was not related to any work performance. Plaintiff subsequently went back to work on March 9th.

45. On March 6, 2020, Defendant Henry called Plaintiff out to interview him regarding two staff misconduct grievances Plaintiff had filed concerning the illegal trashing of his cell and the throwing away of much of his property. However, instead of properly interviewing Plaintiff about his grievances, Henry immediately began to berate Plaintiff over what he wrote, insisting that the staff could do whatever they felt like doing and that Plaintiff should not have been restored back to the Law Library despite the facility's own FOM mandating otherwise.

46. On March 14, 2020, only a week after Plaintiff was restored back to the Law Library, he received a new program card informing him that he was idle again. No reason whatsoever was given for this sudden program change. It was clearly done in violation of procedure since only the Program Committee Chairperson could authorize an inmate's removal from a program. And for a removal to be legal the reasons for said removal had to be documented per Directive #4803 ("Inmate Program Placement") as well as the facility's own FOM.

47. However, none of this occurred. Despite Plaintiff's grievance against Henry for having illegally retaliated against him for having filed a grievance, Plaintiff has yet to be told exactly who authorized his removal or even be given the specific documented reasons for such. Obviously Plaintiff's requests for information were being deliberately ignored in order to prevent Henry from being held liable for retaliation. (Plaintiff was subsequently informed that Henry suddenly retired a few months after Plaintiff filed the grievance against him.)

48. On January 6, 2020, Plaintiff filed an Inmate Claim to recover the cost of all the property which was thrown away and stolen. This Claim was sent to Defendant Tompkins to investigate even though he was responsible for half of the loss. The Claim was subsequently denied on February 27th on the grounds that there was no evidence to support that Plaintiff owned any of the claimed items or that the loss was a result of staff negligence. Upon appeal, however, owing to the fact

11

that Tompkins had stated in a reply to a grievance that Plaintiff's property had supposedly been stolen by unknown inmates, the Superintendent "approved" the Claim for $0 and allowed Plaintiff to repurchase his permit items. In "approving" the Claim the Superintendent stated that, "Staff were not negligent. Inmate failed to properly secure items."

49. This reason for denying Plaintiff's Claim was not only absurd, it indicated that the Administration itself was aiding and abetting the retaliation against him. That is because, according to Directive #4934(II)(1) ("Inmate Property-Temporary Storage of Personal Belongings"), since Plaintiff was sent to both the long-term keeplock unit and was placed under observation against his will, the staff were responsible for taking "immediate steps to protect [an] inmate's property by securing the cell," which the staff clearly did not bother to do. So this was an attempt to cover up the staff's misconduct.

50. Another attempt to cover up the staff's misconduct was also orchestrated by the Office of Mental Health. Despite Plaintiff having filed a detailed grievance, appeals and complaints regarding the misconduct of Defendants Condi and Sullivan, the OMH refused to investigate such. In fact, the facility's MHU steadfastly refused to provide Plaintiff with the names of the staff he interacted with, even though the Mental Hygiene Law made it clear that Plaintiff had a right to review his records. Although Plaintiff kept being told by the Unit Chief that a review of his records would be scheduled, no review ever occurred. It was not until just recently, almost three years later at another facility, on October 18, 2022, that Plaintiff was finally able to obtain copies of his records, such was the attempt to cover up the misconduct. And the records have in fact revealed that there was never any basis to have Plaintiff either sent to observation or kept there, that the reasons for doing so were a lie.

51. After Plaintiff was released from keeplock he wrote numerous letters to the Governor regarding the retaliation he was subjected to since his complaints were not being addressed. These letters were always forwarded to DOCCS Central Office, which then forwarded them to Associate Commissioner Hilton to handle. Hilton, however, never did anything to remedy any of Plaintiff's issues. He just kept informing Plaintiff that he forwarded his letters to the OSI to be investigated

despite Plaintiff having informed him over and over again that the OSI was refusing to investigate any of his complaints. Hilton also sent a copy of these letters to the facility such that the Administration also became aware of Plaintiff's complaints to the Governor.

52. Due to Plaintiff's numerous complaints to both Defendants Yehl and Keller, as well as his grievances against the Administration for aiding and abetting the retaliation against him, Keller offered Plaintiff one small concession. And that was his permission for Plaintiff to buy back a scientific calculator which the staff had stolen, since Keller knew that the staff had in fact stolen his property. However, this actually never amounted to anything since Keller retired right after having given Plaintiff permission, such that when the calculator arrived Yehl refused to let Plaintiff have it. Yehl did this not only to spite Plaintiff for all the complaints/grievances he had written, but also so that the facility would not appear to be conceding that it knew the staff had in fact stolen Plaintiff's property.

53. After Defendant Keller retired, Defendant Carroll became the new Deputy of Security. Carroll was already aware of Plaintiff's numerous complaints about the retaliation he was subjected to as well as his complaints to the Governor. Plaintiff therefore addressed his concerns anew to him, especially in regards to him being restored back to his Law Library job. However, Carroll refused to do anything to remedy any of Plaintiff's complaints.

54. After the facility refused to give Plaintiff a program for nearly a year and a half, which was in complete violation of the Department's own Directives/policies, Plaintiff filed a grievance about this in order to be restored back to his Law Library job. However, Plaintiff was told that since he was removed from his position due to security reasons, he needed to reach out to the Program Committee Sergeant in order to have his job restored.

55. Despite Plaintiff writing and speaking to the Program Committee Sergeant, he was not provided with any sort of answer concerning the restoration of his job. Therefore, Plaintiff wrote another grievance about this and was subsequently told to write to the Deputy of Security (Carroll) about such. However, Carroll never

bothered to answer any of Plaintiff's letters.

56. Since Carroll never bothered to answer any of Plaintiff's letters, Plaintiff filed a grievance about this and was subsequently told by the Superintendent to write to the Deputy of Programs in order to have his job restored.

57. However, after Plaintiff wrote to the Deputy of Programs he still did not receive a reply to his letter. Plaintiff therefore filed yet another grievance about this since it was obvious the facility was playing games with him, bouncing him around from person to person instead of just addressing the issue directly. And once again Plaintiff was told that he was removed from the Law Library due to security reasons, yet was not told what those reasons supposedly were.

58. It needs to be mentioned at this point that in September 2021 a large CERT team comprised of officers not connected with the facility conducted a surprise raid of the entire prison. This was due to all the criminality the staff had been engaging in with the gangs. After not initially finding anything, a week later the CERT team conducted yet another surprise raid, this time concentrating on I-Block. There the CERT team found, in an area controlled by the staff, a large amount of drugs, weapons, cellphones, etc., all being stored in secret for the gang members. In light of this, every single inmate in I-Block was immediately transferred to another facility, whether innocent or not, and the Block was shut down. This was the same Block Plaintiff had been sent to where his property had been stolen by the staff. The corruption in that Block, which Defendant Tompkins oversaw, was that rampant.

59. Due to this raid the previous Superintendent retired and Defendant Yehl was sent to another facility. Defendant Donahue then became the new Superintendent. Shortly thereafter Plaintiff spoke to Donahue in the hope that he would remedy the wrongs which had been done to him, since Donahue was presumably made Superintendent in order to clean up all the corruption. Donahue told Plaintiff to write to him about such, which Plaintiff did, sending him a three page letter which detailed all the misconduct the staff had committed.

60. Over two months later, on February 16, 2022, Plaintiff had

occasion to speak to both Donahue and Carroll in the Law Library. Plaintiff first spoke to Carroll about why he was being denied being reinstated back to his Law Library job for no legitimate security reason when other clerks who had been removed from the Law Library had been given their jobs back. Carroll simply informed Plaintiff that he would not restore him back to the Law Library, yet refused to tell him the reasons why. Plaintiff made it clear to him that they both knew it was being done solely for retaliatory reasons, and that once Plaintiff filed a lawsuit regarding this he would have to divulge the specific reasons why, which Carroll did not have. Carroll did not care.

61. Plaintiff next spoke to Donahue. He admitted that he had received the letter Plaintiff wrote to him and that he had done nothing about such. Although Plaintiff reiterated to him the illegal retaliation he had been put through, and informed him that the facility treated gang members better than model inmates like Plaintiff, Donahue still did not care to address any of Plaintiff's concerns, not even in having him restored back to the Law Library. All Donahue said was that Plaintiff should put in for a transfer to another facility. This revealed that, instead of being sent to Elmira to clean up the corruption, Donahue was aiding and abetting the retaliation against Plaintiff simply as a favor to the staff. This can be seen by what occurred next.

62. In what can only be considered a blatant act of retaliation, the very next day Plaintiff was called out to speak to an Investigator from the OSI, Defendant Meyers. Plaintiff thought that this interview was in regards to his complaints to the Governor. Instead, Meyers was investigating a PREA complaint which he had suddenly, mysteriously received concerning Plaintiff having a relationship with a staff member. Despite Meyers asking Plaintiff seemingly innocent questions at the outset, it turned out that he was actually investigating whether Plaintiff had a close relationship with the Law Library officer. Plaintiff wholeheartedly denied this since it was complete nonsense. The real reason for this interview, however, was evident: Meyers was going through the motions to have Plaintiff transferred as a favor to Donahue and Carroll due to Plaintiff's complaints to them.

63. As Plaintiff mentioned above, when Carroll told him that he was denying his request to be restored back to the Law Library for

security reasons, Plaintiff stated to him that he would have to divulge the reasons why if her were to file a lawsuit. In addition, when Donahue told Plaintiff that he should put in for a transfer, Plaintiff replied that he was not interested in one and had just declined a preference transfer two days prior. This not only meant that Plaintiff could not just simply be transferred out of the blue, but that in order to justify why Plaintiff had been denied a program for over two years some type of reason had to be conjured up. Therefore, Donahue and Carroll fabricated information to Meyers that Plaintiff supposedly had a close relationship with the Law Library officer, which Meyers was only too willing to act upon as favor to them since this would guarantee Plaintiff's transfer.

64. And indeed, only three days later, on February 22, 2022, Plaintiff was informed that he was being transferred to Greenhaven Correctional Facility due to "separation from staff" as a reason. Since Plaintiff had seen this coming he filed a grievance about this right after his interview with Meyers. As with his grievance against Defendant Henry, all three Defendants (Donahue, Carroll and Meyers) have claimed innocence and Plaintiff has yet to be told who actually had him transferred and why. It just magically happened.

## Exhaustion Of Administrative Remedies

65. Pursuant to 42 U.S.C. §1997e(a) all the issues mentioned in this claim were extensively grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee.

## SECOND CLAIM
### FOURTEENTH AMENDMENT VIOLATIONS

## Illegal Confiscation Of Legal Material

66. Plaintiff adopts by reference all the allegations/facts mentioned in paragraphs 27, 41 and 43 in his First Claim regarding the illegal confiscation of all his legal/reference material, stamps and address book which was ordered by Defendant Chapman and withheld from Plaintiff for 66 days. Chapman did this not only to harass Plaintiff, but without any sort of due process. No notice was ever given to

Plaintiff that his material had been confiscated or the reasons why. In fact, despite Plaintiff's numerous complaints regarding the whereabouts of his material, no one would tell him who had confiscated such or even if any of it would be returned. This prevented Plaintiff from engaging in any legal activity whatsoever.

Illegal Revocation Of Law Library Job

67. Plaintiff adopts by reference all the allegations/facts mentioned in paragraphs 44, 45, 46 and 47 in his First Claim regarding the illegal revocation of his Law Library job by Defendant Henry in retaliation for Plaintiff having filed a grievance. Henry did this not only to harass Plaintiff, but without any sort of due process. Plaintiff was never called before the Program Committee in order to be told that his program was being revoked, nor was any other procedure followed in order to document the reasons for said revocation. In fact, due to this illegal revocation Plaintiff was never able to regain his job.

Plaintiff Was Wrongfully Confined

68. Although Plaintiff's keeplock confinement only amounted to 30 days, which is technically far below the number of days required to establish an outright atypical and significant hardship, that is not dispositive in this case. That is because Plaintiff's confinement did in fact amount to an atypical and significant hardship due to the conditions of his confinement. Moreover, it also amounted to a substantive due process violation.

69. The atypical conditions of confinement Plaintiff was subject to were as follows:

a) Plaintiff's cell was not only searched due to him being in possession of a legally obtained employee roster, he was also illegally placed in a shower so that he could not observe the thorough trashing of his cell.

b) Plaintiff was taken from his cell in his boxers to a long-term keeplock unit even though no contraband was found in his cell and the charges did not support such an action. The long-term keeplock unit is reserved for more serious charges which result

in more than 30 days keeplock, and placement there only occurs
--absent exigent circumstances-- after a hearing in which an
inmate is found guilty of the charges.

c) Along with Plaintiff's cell being trashed, a substantial amount
of his property was illegally thrown away, not to mention the
unwarranted confiscation of all his legal material, stamps,
address book, and other reference material, leaving him with no
ability to do any legal work or write to anybody for weeks,
especially since his material was returned in complete
disarray, all wet and torn apart.

d) Plaintiff was not only illegally sent to observation for
complaining about the loss of his property, he was also
illegally kept there under harsh conditions and threatened with
a prolonged stay if he continued to complain about the
retaliation he was being put through.

e) When Plaintiff returned from observation he discovered that the
staff had gone in his cell and stole every remaining item of
value he had, leaving him practically destitute.

f) To add more insult to injury, Defendant Tompkins refused to
provide Plaintiff with a razor to shave with even though his
beard trimmers and electric razor had been stolen by the staff.

g) Plaintiff's Inmate Claim was denied for the most ridiculous of
reasons: "Staff were not negligent. Inmate failed to properly
secure items," even though the staff were twice directly
responsible for the massive loss Plaintiff suffered.

h) Lastly, the Appellate Division reversed the charge of
possessing employee information, meaning that there was never
any legitimate reason for all the above to have occurred.

70. It is simply not typical for inmates to be sent to long-term
keeplock units on contrived charges simply to retaliate against them
for being in possession of legally obtained material. Moreover,
inmates in keeplock status are not expected to endure the significant
hardships Plaintiff went through. As such, since Plaintiff had a
protected liberty interest in being free from retaliation, the
malicious treatment he was subjected to amounted to a substantive due

process violation since the staff's actions against him were nothing less than conscience shocking. Therefore, Plaintiff was wrongfully confined in every sense of the word.

## Exhaustion Of Administrative Remedies

71. Pursuant to 42 U.S.C. §1997e(a) all the issues mentioned in this claim were extensively grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee.

## THIRD CLAIM
## EIGHTH AMENDMENT VIOLATIONS

### Unwarranted Cell Searches

72. The Eighth Amendment's prohibition of cruel and unusual punishment bars cell searches that lack any legitimate penological interest and are intended solely to harass. This type of claim comprises a subjective element and an objective one.

The subjective element requires an inmate to assert facts indicating that the responsible official had a sufficiently culpable state of mind amounting to at least deliberate indifference to his constitutional rights. And the objective element requires that the deprivation alleged by the inmate be sufficiently serious such that it suggests a denial of the minimal civilized measure of life's necessities.

73. As to the subjective element, there can be no question that the malicious demolishment of Plaintiff's cell in pure violation of Directive #4910, which mandates that searches be conducted in an orderly fashion, along with the throwing away of much of his property, not to mention the confiscation of all his legal material, etc., was wanton in nature, especially since there was no legitimate cause for such. Thus Defendants Chapman, Dominikoski, Austin, and their John Doe companions evinced a sufficiently culpable state of mind that they sought to harass Plaintiff. And the same goes for Defendant Tompkins and the other two John Doe Defendants who went to Plaintiff's cell in his absence and maliciously stole every single remaining item of value.

74. As for the objective element, the fact that Plaintiff was left in a cell with barely any property, absent all of his legal/reference material and stamps, etc., for a significant period of time, including when the material was returned in a ruined state, with not even the ability to shave even if he did have a mirror (which was also stolen along with all his cosmetics), clearly reveals that Plaintiff's deprivations were sufficiently serious to suggest a denial of the minimal civilized measure of life's necessities while he was keeplocked, in thorough contrast to the other keeplocked inmates who lived far more comfortably with all of their property.

## Illegal Infliction Of Psychological Pain

75. The Eighth Amendment's prohibition of cruel and unusual punishment also encompasses the unnecessary infliction of psychological pain. In order to state such a claim the psychological pain must have been (1) intentionally inflicted and (2) more than de minimis in nature.

76. Plaintiff adopts by reference all the allegations/facts mentioned in paragraphs 28, 29, 30, 32, 33, 34, 35 and 37 in his First Claim, regarding the illegal infliction of psychological pain by Defendants Condi and Sullivan.

77. Condi not only aided and abetted the retaliation against Plaintiff by having him placed under observation in the hospital over the weekend, she was well aware that she was inflicting psychological pain upon Plaintiff since he not only objected to Condi's inappropriate questions, there was no indication that he intended to harm himself.

78. The records reveal that while Plaintiff was in the hospital he was continuously yelling and banging/kicking/punching the door to be let out. And that when the nurses tried to talk to Plaintiff, including Condi, he raved at them that they were violating his constitutional rights. As such, Condi was very well aware of the severe emotional distress she had inflicted upon Plaintiff, yet she still did not bother to order Plaintiff's release.

79. To make matters worse, in order to spite Plaintiff he was

placed in a dirty observation room with a filthy mattress, given only a smock and two small coverings to cover himself with despite shivering on both days due to the cold, was not given any soap to wash his hands with after he used the bathroom, nor was he provided with any other hygiene product. Needless to say, this harassment not only exacerbated the severe stress Plaintiff was already experiencing over his property loss, it made Plaintiff so angry that he began to hyperventilate and was barely able to sleep for two days.

80. In addition to the above, the severe stress Plaintiff was under was further compounded by Sullivan. The MHU records reveal that when Sullivan spoke to Plaintiff the following Monday Plaintiff also raved at her about his constitutional rights having been violated, not only by him having been illegally placed under observation, but also due to the conditions of his confinement. However, Sullivan was not interested in hearing anything Plaintiff had to say. Although she did tell Plaintiff that he would be released that morning, this turned out to be a lie.

81. Later that morning, Plaintiff was taken to the MHU building to supposedly be processed out. Yet when Plaintiff arrived there he was told that Sullivan recommended that he be kept under observation for another day simply because she did not like the way Plaintiff spoke to her. Again, this was being done not only out of spite, but as a favor to the staff, since there was no valid reason for such. Needless to say, this made Plaintiff so stark raving mad that he nearly went to blows with the security staff there. It was only due to the intervention of Defendant Keller, who promised Plaintiff that he would look into his complaints, which eventually prevented any violence.

82. The next day, when Plaintiff spoke to Sullivan again, the records reveal that Plaintiff was infuriated and again mentioned that his confinement amounted to cruel and unusual punishment (for the second time Plaintiff was not provided with any soap or hygienic product, was hyperventilating, and was unable to sleep in the least). This did not matter to Sullivan, though. She made it clear to Plaintiff that if he continued to complain about what was being done to him she would ensure that he remained under observation indefinitely, a clear threat. As such, there can be no question that Sullivan deliberately inflicted psychological pain upon Plaintiff

which was more than de minimis.

## Exhaustion Of Administrative Remedies

83. Pursuant to 42 U.S.C. §1997e(a) the issue mentioned in this claim pertaining to unwarranted cell searches was grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee. However, the issue pertaining to the illegal infliction of psychological pain was not grieved through the Inmate Grievance Program since such is prohibited due to the Office Of Mental Health being an outside agency. Plaintiff therefore filed a separate grievance via the Central New York Psychiatric Center's procedures, up until the exhaustion of such.

## FOURTH CLAIM
### SUPERVISORY LIABILITY

84. In order for a state official to be held liable under §1983 for a constitutional violation a plaintiff must plead and subsequently prove the official's personal involvement in the violation. This can be shown by the official's actual or direct participation in the constitutional violation, or by the official's failure to remedy a wrong after being informed through a report or appeal.

### Defendant Yehl

85. Not only did Plaintiff complain numerous times to Yehl about all of the illegalities the staff had committed against him, Yehl also personally investigated various complaints Plaintiff had written. Yet despite being informed of all the constitutional violations the staff had engaged in, Yehl did nothing to remedy any of it. Instead, he actively continued the retaliation against Plaintiff by refusing to have all of Plaintiff's legal material returned, for no legitimate reason, or to even have Plaintiff's Inmate Claim paid despite knowing that it was the staff who threw away/stole his property. In addition, Yehl also refused to have Plaintiff restored back to his Law Library job even though he knew that Defendant Henry had illegally removed Plaintiff from his position.

## Defendant Keller

86. As with Yehl, exactly the same holds true with Keller, except that Keller was even more apprised of the constitutional violations the staff had committed against Plaintiff. Keller not only bore witness to Plaintiff having been illegally placed under observation, he even witnessed Plaintiff's nearly barren cell right after the staff's theft of his property occurred when he made his rounds in the long-term keeplock unit and Plaintiff informed him of the staff's malfeasance. Yet the only thing Keller ever did to make up for Plaintiff's huge property loss was to allow him to buy back a scientific calculator, although this never amounted to anything due to Keller's sudden retirement and Yehl's opposition to Plaintiff receiving such.

## Defendant Carroll

87. After Keller's sudden retirement Carroll became the new Deputy of Security. Due to Plaintiff's numerous complaints about the retaliation he was subjected to, including his complaints to the Governor which were brought to Carroll's attention, Carroll was well aware of Plaintiff's concerns. However, despite Plaintiff's numerous conversations with Carroll, not only did he refuse to do anything to remedy the constitutional violations which had occurred, he actively prevented Plaintiff from being restored back to his Law Library job, for no legitimate reason whatsoever. And in the end, due to Plaintiff's complaints about his former job, Carroll retaliated against him by orchestrating his transfer to another facility.

## Defendant Donahue

88. Donahue became the new Superintendent of Elmira after the previous Superintendent was forced out due to the rampant criminality occurring between the staff and the gangs in the facility. Believing that Donahue was sent to Elmira for the express purpose of cleaning up the facility, Plaintiff spoke to and wrote Donahue about all the constitutional violations he had been subjected to. However, Donahue did nothing to remedy any of the staff's misconduct. Instead, despite having been apprised of Plaintiff's complaints, and even knowing about

his complaints to the Governor, when Plaintiff spoke to Donahue two months later in front of Carroll about his complaints Donahue retaliated against Plaintiff by orchestrating his transfer to another facility.

## Exhaustion Of Administrative Remedies

89. Pursuant to 42 U.S.C. §1997e(a) all the issues mentioned in this claim pertaining to the named Defendants were extensively grieved through the Inmate Grievance Program and subsequently appealed to the Central Office Review Committee.

## CONCLUSION

90. The retaliation Plaintiff was subjected to by Defendants had no legitimate motive whatsoever. Defendants deliberately set out to wreak as much havoc as they could upon Plaintiff simply to retaliate against him and to have him removed from his position as a Law Library paralegal for being in possession of an employee roster, which the staff wrongfully believed was a threat to them. These illegal acts of Defendants caused Plaintiff to suffer great mental anguish, the full extent of which can not be measured.

WHEREFORE, Plaintiff respectfully requests that the Court:

A) Direct service of this Complaint by the U.S. Marshals upon all of the named Defendants due to Plaintiff residing in a hospital, which restricts his ability to do legal work.

B) Appoint counsel to represent Plaintiff in this matter due to Plaintiff residing in a hospital, which restricts his ability to do legal work.

C) Grant compensatory damages to Plaintiff in an amount sufficient to compensate him for the malicious and extensive retaliation he suffered, but in no event less than $100,000.

D) Grant punitive damages to Plaintiff for the willful and egregious violations of his rights by Defendants in order to deter them from committing further acts of misconduct in the future, but in no event less than $100,000.

Under Federal Rule of Civil Procedure 11, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass; (2) is supported by existing law; (3) the factual contentions have evidentiary support; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: December 1, 2022

Frederick Diaz #86B2129
Mohawk Corr. Facility
Box 8451
Rome, N.Y. 13442